A bill of indictment numbered 2397, charging Roderick Davenport, C. T. Jones, Johnnie Heath and J. R. Hunning, with conspiracy to *Page 478 
obtain money by means of false pretense and of obtaining money under false pretense, was returned at the August Term, 1944, of Pitt County.
A similar bill, numbered 2403, was also returned against the defendants Roderick Davenport, S. H. Powers, Al Whorton and Wilson Boyles at the same term of court, which reads as follows:
"The Grand Jurors Upon Their Oath Present:
"That Roderick Davenport, S. H. Powers, and Al Whorton, and Wilson Boyles, late of the County of Pitt, and on the 24th day of August, A.D., 1944, and prior and subsequent thereto, with force and arms, at and in the County aforesaid, unlawfully, knowingly, designedly, wickedly, deceitfully, and feloniously, with intent to cheat and defraud, did combine, conspire and plan together among themselves each with the other and with each other to obtain large sums of money from the public in general and Mrs. J. R. Hunning, C. L. Brady, Mrs. Alice Proctor, Bobbie Brady and Billy Brady, in particular, by means of false pretense, contrary to the form of the statutes in such case made and provided, and against the peace and dignity of the State;
"And the Grand Jurors for the State Upon Their Oath do Further Present:
"That afterwards, to-wit: On the day and year aforesaid, the aforesaid Roderick Davenport, S. H. Powers, Al Whorton, and Wilson Boyles, late of the County of Pitt, in pursuance and furtherance of said conspiracy planned and designed, unlawfully, knowingly, designedly, wickedly, deceitfully, and feloniously, with intent to cheat and defraud, did unto Mrs. J. R. Hunning, C. L. Brady, Mrs. Alice Proctor, Bobbie Brady, and Billy Brady, and various and sundry others falsely pretend that they could legitimately lend money at 10 percent interest per week or sufficiently high rate of interest to justify their paying 5 percent interest per week on all deposits made with them and that they were solvent, and that their business and transactions had been investigated and found to be legal, and if deposits were made with them, they would give their checks for the same, which checks would be payable at any time upon presentation and demand, but that for so long a time as their checks were held by the depositors and not cashed, that they, the depositors, would be paid 5 percent per week on the amount deposited;
"And in consequence of said false and fraudulent statements and pretenses upon the truth of which said Mrs. J. R. Hunning, C. L. Brady, Mrs. Alice Proctor, Bobbie Brady, and Billy Brady, and various and sundry others relied, the said defendants did then and there obtain from Mrs. J. R. Hunning, the sum of One Thousand ($1,000.00) Dollars; from C. L. Brady the sum of Six Hundred and Fifty ($650.00) Dollars; from Mrs. Alice Proctor the sum of Fifty ($50.00) Dollars; from Bobbie Brady the sum of Sixty ($60) Dollars; and from Billy Brady the sum of Twenty Five ($25.00) Dollars, and from various and sundry others *Page 479 
large sums of money for the defendants' own personal use and for which they gave their checks payable upon presentation and demand;
"Whereas, in truth and in fact, said defendants could not lend out said money in sufficient quantity at a high rate of interest with which to pay said 5 percent interest per week on said deposits, which fact was well known to said defendants, and at the time said false and fraudulent statements were made, as aforesaid, and in truth and in fact said defendants were not solvent, and their business or transactions were not legal and their checks given to the parties aforesaid, and other depositors, were not good and payable upon presentation and demand as the said defendants did not have sufficient funds on deposit or credit with the banks upon which said checks were drawn with which to pay said checks upon presentation and demand, which facts were well known to the said defendants at the time said false and fraudulent statements were made to the said Mrs. J. R. Hunning, C. L. Brady, Mrs. Alice Proctor, Bobbie Brady and Billy Brady, and other depositors, and said false and fraudulent statements were designedly, falsely and fraudulently made by the said defendants for the purpose of deceiving and defrauding and in fact did deceive and defraud;
"By means of said false pretense, the said Roderick Davenport, S. H. Powers, and Al Whorton, knowingly, designedly, and feloniously did then and there unlawfully obtain from Mrs. J. R. Hunning the sum of One Thousand ($1,000.00) Dollars in lawful money and of the value of $1,000.00, the property of Mrs. J. R. Hunning; and did then and there unlawfully obtain from C. L. Brady the sum of Six Hundred Fifty ($650.00) Dollars in lawful money and of the value of $650.00, the property of C. L. Brady; and did then and there unlawfully obtain from Mrs. Alice Proctor the sum of Fifty ($50.00) Dollars, in lawful money, and of the value of $50.00, the property of Mrs. Alice Proctor; and did then and there unlawfully obtain from Bobbie Brady the sum of Sixty ($60.00) Dollars, in lawful money, and of the value of $60.00, the property of Bobbie Brady; and did then and there unlawfully obtain from Billy Brady the sum of Twenty Five ($25.00) Dollars, in lawful money, and of the value of $25.00, the property of Billy Brady, and did then and there unlawfully obtain from various and sundry others large sums of lawful money, their property, with intent then and there to defraud, contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State."
The two cases were consolidated for trial and tried together with the consent and approval of counsel for the defendants.
Before pleading to the bills of indictment, the defendant Roderick Davenport, through his counsel, moved to quash the bills of indictment and filed separate but similar motions as to each bill. The pertinent parts of the motion in No. 2403 read as follows: *Page 480 
". . . 2. That as to the first count of the bill of indictment, the same is fatally defective for that:
"A. Bill in said count does not set out, or allege any means or plans to be employed by the defendant, or either of them by which any cheat, fraud or fraudulent pretense was to be perpetrated or accomplished against anyone.
"B. The bill in said count does not set out or allege any means, plan, scheme, contrivance, to use, fraud or force, or criminal act or offense, by means of which the defendants or any of them contrived, or conspired against any person, firm or corporation, the public in general, or James R. Worsley, Thad Wooten, J. R. Rouse and W. M. Tripp, in particular, to their damage or otherwise.
"C. That nowhere under any construction alleges any facts which constitute any offense against the criminal law of the State.
"D. As a whole, and in the second count, doesn't aid or strengthen the first count in the matters and things that were complained of.
"3. That as to the second count in the bill of indictment, the same is fatally defective for that:
"(A) Alleges, simply, that the defendants were in the loan business and held themselves out as such, and as being willing to lend such money as they could borrow at 5% per week from Mrs. J. R. Hunning, C. L. Brady, Mrs. Alice Proctor, Bobbie Brady and Billy Brady, and from various and sundry others to someone else at the rate of 10% per week, which allegations, proved, could not subject the defendants, singly or collectively, to criminal prosecution.
"(B) It alleges simply that checks issued in carrying on the loan business by the defendant were in fact and in law mere unsecured evidence of debt and demand promissory note payable by the defendants at some Bank in the amount of $1,000, to the lender, Mrs. J. R. Hunning; $650, to the lender, C. L. Brady; $50, to the lender Mrs. Alice Proctor; $60, to the lender Bobbie Brady, and $25, to the lender Billy Brady, at any time the aforesaid lenders, Mrs. Hunning, C. L. Brady, Mrs. Alice Proctor, Bobbie Brady and Billy Brady, or any of them, decided that they did not care longer to receive interest from the defendants at the rate of 5% per week, or 260% per annum, which allegations, proven, could not, in law, subject the defendants, singly or collectively, to criminal prosecution or punishment.
"(C) The bill as a whole, and the first count, does not aid or strengthen the second count, in the matters and things complained of in reference to the second count.
"(D) It nowhere under any interpretation or construction alleges any facts which constitute any offense against the criminal laws of the State. *Page 481 
"4. The bill of indictment as a whole, does not allege any offense against the criminal laws of the State.
"Wherefore, The Defendant, Roderick Davenport, respectfully moves the Court:
"1st: That the first count in the bill of indictment be quashed and set aside.
"2nd. That the second count in the bill of indictment be quashed and set aside.
"3rd. That the bill of indictment as a whole be quashed and set aside."
Both motions were denied and the defendant, Davenport, excepted.
All the books and other records pertaining to the business of the defendant Davenport, that could be located by the State, were seized by order of the court, and impounded with the Clerk of the Superior Court of Pitt County, in August, 1944, upon the return of the above bills against the defendants. Such records were made available to the State and the defendant Davenport for use in the trial below.
A summary of the evidence may be stated as follows:
1. The appealing defendant, Roderick Davenport, a college graduate in accounting and business administration, after graduation, practiced as a senior accountant in Winston-Salem for five years. He later went to Florida, where he sold specialty advertising for about five years. He then returned to New Bern, his home town, where he resided for 15 or 16 years prior to the trial of this cause. After his return to New Bern, he engaged in the retail and wholesale grocery business. He went broke during the late depression and according to his testimony he was left with only "two cents." Thereafter for five years he was engaged in the mercantile brokerage business, and then became an agent for the Southern Dixie Life Insurance Company, an industrial insurance company. While engaged in selling industrial life insurance, Davenport developed a small loan business. He charged his borrowers 10% interest per week, and in 1943 had a "few hundred dollars" invested in his loan business.
2. In the early part of 1944, Davenport first began his business in New Bern, which he operated in connection with a "fruit and produce" business. The evidence tends to show that the "fruit and produce" business was used as a "front" for the lending and borrowing operations which became known as the "Davenport System." During the Spring of 1944, stores were opened at Kinston, Goldsboro, Greenville and Rocky Mount. All the stores were owned by Davenport and operated under the name of Dixie Produce Company, except those in Goldsboro, which were operated under the name of Kay Produce Company. One of the New Bern stores was popularly known as the "Big Apple." *Page 482 
THE DAVENPORT SYSTEM
The evidence tends to show the Davenport Plan or System was to solicit deposits or loans from individuals through paid solicitors and from the public generally through advertisements and otherwise; and to assure the depositors that Davenport was solvent and was able to loan out all moneys loaned to or deposited with him at 10% per week or at a sufficiently high rate of interest to enable him to pay the depositors 5% interest per week on his deposit. The depositor was given a check on the Branch Banking 
Trust Company, New Bern, N.C. and advised that it could be cashed any time, but so long as the depositor held the check he would be paid 5% interest per week thereon.
3. According to the testimony of the defendant, Davenport, his deposits or loans possibly did not exceed $1,000.00 in January, 1944. Thereafter the business expanded rapidly.
4. A representative of the State Bureau of Investigation, W. I. Gatling, checked the deposit books and loan records of the Davenport Loan Business at Goldsboro, on 2 August, 1944, and found approximately $60,000.00 had been taken in as deposits and approximately $6,000.00 loaned out. On the following day Mr. Gatling had a conference with Davenport, and advised him to liquidate his business, but Davenport insisted that he was solvent, that he was making money and was loaning out all the money deposited with him at ten percent per week.
5. During the progress of the trial below, W. R. Boyles, one of the defendants under bill of indictment No. 2403, entered a plea of nolocontendere in lieu of his plea of not guilty; and S. H. Powers, another defendant under the same bill, changed her plea from not guilty to guilty. The State took a nol. pros. as to Al Whorton, also named as a defendant in this bill of indictment.
The defendants named in bill of indictment No. 2397 were Roderick Davenport, C. T. Jones, Johnnie Heath and J. R. Hunning. C. T. Jones, the manager of the Greenville Store, died prior to the trial. The State took anol. pros. as to Johnnie Heath and J. R. Hunning.
The State used Boyles, Powers, Whorton, Heath and Hunning as witnesses.
6. W. R. Boyles, manager of the Kinston office of the defendant's business and special representative of Davenport, testified that he began working for Mr. Davenport in March, 1944, at Kinston. Prior to that time he worked for him a short time at the Goldsboro store. He tried to check the records and found the store had no system of bookkeeping at all. "You could not tell how many depositors he had or to whom interest had been paid, or how much had been paid." When he went to Kinston no loans were being made there, and after he "saw what the business was" he let it be known he was going to quit. One depositor *Page 483 
drew out $1,700.00, but when the witness informed him he had decided not to quit, the depositor put his money back in the Kinston store. The witness discussed the financial condition of the business with Davenport, and asked him what he was going to do about all the checks he was giving out. Davenport said he "was going to buy them up." Davenport instructed Boyles what to have the employees tell depositors about the checks received for their deposits. The instructions were given to tell the depositors the checks were good and could be cashed any time at the Bank, but if the checks were cashed the interest would stop. Boyles further testified that he bought liquor at $10.00 a quart and gave it away to "help get more deposits." They also gave away fruit and produce for this same purpose.
After W. I. Gatling had checked the books of the Goldsboro Store, he went to Kinston and arranged for a conference with Davenport. Davenport, W. R. Boyles and Hugh Gaskins, manager of the Goldsboro Store, met in a hotel in Kinston, for a conference, before Davenport met with Mr. Gatling. Davenport, according to the testimony of this witness, while in this conference, instructed him to change the depositors' lists. "I said, `How do you want them changed?' and he says, `Well, where there is a thousand dollar deposit change it to one hundred dollars, and where there is a $100.00 deposit change it to a ten.'" Boyles further testified he changed some of the records himself and at Davenport's request had the bookkeepers at other stores to make the changes, except in Goldsboro, where the S. B. I. had already checked the books.
7. The evidence tends to show that a fake deposit book was prepared for the Rocky Mount Store. The original book showed deposits made in the store of $24,295.00. When the representative of the S. B. I. called for the books of that store, on 23 August, 1944, for the purpose of checking the deposits, he was given the fake deposit book which contained the names of depositors but showed deposits of only $3,623.50. The evidence further tends to show that the fake books were made up to prevent the S. B. I. from ascertaining the correct amount of deposits held by Davenport. But Davenport instructed Boyles to tell the bookkeepers that the books were being changed to protect the depositors "about interest on the income tax." The records were also changed at the Greenville office by the bookkeeper on instructions from the defendant Boyles.
8. It became known that the S. B. I. was checking the records of the Davenport Loan Business, and withdrawals became heavy. Certain articles were published in newspapers circulated in Eastern North Carolina to the effect that it "appeared that Davenport was violating the usury laws of the State, which was a civil matter but not a criminal offense"; Whereupon Davenport, on or about 11 August, 1944, began to run advertisements in theWilson Times, Greenville Reflector, Goldsboro *Page 484 News-Argus, News and Observer, Raleigh Times, and Sun Journal. The advertisement were substantially the same as those which appeared in theWilson Times, 11 August, 1944, as follows:
"Message from owner of Dixie Produce Company.
"I borrow money and legally pay the lender 5 percent a week. I lend this money at a higher rate — This makes me solvent and responsible to my lenders. An investigation has proven the legality of this business. I invite your loans and your borrowing at Kinston, Goldsboro, Rocky Mount and Greenville, N.C. My managers will accept your loans and pay 5 percent weekly or extend loans to borrowers.
"We accept to have a store in Wilson as soon as a building can be secured, however, if you would like to do business with us before that time, our nearest store at the present is Dixie Produce Company, 211 S. Main Street, Rocky Mount — or wire or write me at Post Office Box 789, New Bern, N.C.
"Roderick Davenport, Owner, Dixie Produce Company."
And in the Goldsboro News-Argus, 12 August, 1944, as follows:
"I borrow money and pay the lender 5 percent a week.
"I loan this money at a higher rate. This makes me solvent and responsible to my loaners. An investigation has proven the legality of this business. I invite your loans and borrowings at New Bern, Kinston, Goldsboro, Rocky Mount and Greenville, N.C.
"My managers will accept your loans and pay five percent weekly or extend loans to borrowers.
"Kay Produce Co. Roderick Davenport, owner — Hugh Gaskins, Manager. 1001 Greenleaf St., Goldsboro, N.C. Phone 313."
9. S. H. Powers testified that in an effort to obtain more deposits, decoy or "pretended" deposits were made at the request of Davenport. Money was furnished by him to certain individuals who would make a deposit in the presence of prospective customers. She would write a check and give it to the decoy depositor and the check would be given back. She testified "that was done to make an impression on the people who were there." And she further testified that such deposits were made during the second week in August; and at one time a prospective customer deposited $700.00 or $800.00 immediately after a decoy deposit was made. That she knew after 1 August, 1944, that Davenport was insolvent and could not possibly pay out, but that she "was too deep in it to do anything about it." She and Davenport changed certain records. That Davenport received numerous deposits and made no record of them. No book records were kept of deposits at the New Bern office. Such records as were made consisted of notes, which were kept in the desk drawer. She destroyed the records which contained the names of the employees and solicitors. At Davenport's request she hid the records in *Page 485 
the New Bern office for several days to prevent the S. B. I. from checking them. She called Davenport's attention to the condition of his loans in proportion to his depositors, and he said "He had so many loans that he could not put them on the books and could not tell her about." loans did not exceed one-tenth of the deposits. Lots of fruit was given away. When a person "would come in and deposit money they were always given oranges or apples or whatever happened to be in the store. . . . almost every day whiskey was brought in the store and charged to Mr. Davenport, and he would give it to the depositors." Mr. Davenport's activities were directed "to getting deposits."
In response to a question as to whether or not she had an opinion satisfactory to herself as to the total amount of deposits received by Davenport, from the time she began to work for him in March, 1944, until the business was closed, she testified: "From the figures I have here from the daily reports that were received each day and the daily reports that were made that I know about the money that was paid in deposits that there was no record kept whatsoever, it was $1,940,000.00." This witness further testified that the last time she saw Mr. Davenport before his arrest, was in Goldsboro, and he had between $15,000.00 and $18,000.00 in cash in his possession.
As to the method of making loans, this witness testified that borrowers would give a check payable to bearer. The "check was held at the New Bern office or store; they did not return the checks unless the person that borrowed the money asked for them. They just filed them away and kept the . . . checks." Most of the loans were from $5.00 to $15.00, some of them were for $30.00 or $40.00.
10. C. T. Jones, manager of the Greenville Store, received from Davenport a check, on 22 August, 1944, in the sum of $1,900.00, which had been deposited with Davenport by F. O. Muth, 21 August, 1944. Jones took the check and deposited it in the Guaranty Bank Trust Company, Greenville, N.C. and on 25 August, 1944, drew out the entire amount and took the money and applied it on indebtedness which he claimed Davenport owed to him. After taking this $1,900.00, he resigned as manager of the Greenville Store. Prior to this time, Jones had admitted to at least one depositor that he was without funds and could not pay a check issued at the Greenville Store, payable to the depositor. He told the depositor he had loaned out her money.
11. Heath and Hunning solicited deposits and told depositors the checks issued for deposits were good. Hunning obtained deposits as late as 21 August, 1944, and as an inducement to obtain the deposits, he said "to put it in there, that he guaranteed our money, said it was good any time." Heath told depositors the checks were good and could be cashed any time at the Banks. He solicited deposits for about seven weeks and was paid a weekly salary of $30.00 and a commission on all deposits *Page 486 
made by persons solicited by him. Davenport furnished him an automobile to use while soliciting business.
12. The evidence tends to show that Davenport told prospective depositors that he was bonded and licensed to do business, that he had money in the bank to take care of every dollar of people's money that he had, that his check was as good as a Government check and that they could get their money at any time. That he was loaning out all the money he could get at ten percent per week and was making money. That he was solvent and had property and could get any help he needed from friends. And when a prospective depositor seemed reluctant to make a deposit, he was told that certain prominent people were doing business with him. Some of those whose names he used had never deposited any money with him.
Statements of similar import were made by his employees and solicitors. The evidence also tends to show that many persons solicited for deposits did not make them until they talked to Davenport and had his assurance that he was solvent and that his depositors were protected by a bond. Deposits were also made in response to the advertisements carried in the papers, to the effect that the business had been investigated and found legal.
13. According to the evidence introduced by the State and the defendant Davenport, some of Davenport's records of loans were missing. Financial statements prepared from the records in evidence, were introduced by the State and tend to show the following:
(a) From 20 July through 28 August, 1944, the defendant's Greenville Store received in deposits $21,961.50; paid to depositors as interest on deposits $2,950.66; loaned to borrowers $1,390.50, and collected on loans, principal and interest $629.25.
(b) From 19 June through 29 August, 1944, the defendant's Goldsboro Stores received in deposits $89,443.70; paid to depositors as interest on deposits $16,257.72; loaned to borrowers $22,214.25, and collected on loans, principal and interest $21,712.62.
(c) From 13 March through 30 August, 1944, the defendant's Kinston Stores received in deposits $157,884.00; paid to depositors as interest $78,600.30; loaned to borrowers $22,692.00, and collected on loans, principal and interest $18,212.54.
(d) From 1 July through 2 September, 1944, the defendant's Rocky Mount Store received in deposits $24,295.00; paid to depositors as interest on deposits $4,835.55; loaned to borrowers $7,261.60, and collected on loans, principal and interest $3,544.35.
(e) The State's exhibit does not show the period during which deposits were received at the New Bern Stores, or in the office of the defendant in the Mohn Building in New Bern, but does show total *Page 487 
deposits received in New Bern as $501,612.06; no record of the amount of interest paid to depositors in New Bern was introduced in evidence, but the exhibit does not show the amount loaned to borrowers as $71,641.00, and the amount collected on loans, principal and interest in New Bern as $46,616.64.
(f) These exhibits show deposits received in the sum of $795,196.26; interest paid to depositors on deposits $102,644.23; loaned to borrowers $125,199.85, and collected on loans, principal and interest $90,715.40. The evidence shows that depositors withdrew the sum of $146,691.06. According to these exhibits, Davenport is still due his depositors $648,505.20.
(g) According to the evidence, Davenport admitted his insolvency on 6 September, 1944, in a civil action brought for the purpose of having a Receiver appointed for his loan business. The evidence further shows that all of Davenport's known assets, consisting of fruits, vegetables, merchandise, office fixtures and equipment, motor vehicles, etc., amounted to only $13,164.83 on 31 August, 1944, except certain checks payable to cash which checks Davenport testified represented loans outstanding and due him. The evidence tends to show that many of these checks had been paid and that others were worthless and uncollectible, since the purported makers were insolvent, if indeed such checks had been executed for loans.
14. The defendant Davenport testified he had over one hundred employees and that he owned and operated nine automobiles and one truck in connection with his business. The evidence shows he maintained an office in the Mohn Building in New Bern and operated two stores in New Bern, two in Goldsboro, two in Kinston, one in Rocky Mount and one in Greenville.
The evidence further tends to show that all the stores operated by Davenport lost money continuously in 1944, both in the loan business and in the fruit and produce business as operated under the Davenport System, without taking into consideration any expenses incurred for salaries, commissions, purchase, maintenance and operation of automobiles, rents on store buildings, taxes, insurance, or other expenses.
15. According to the evidence, all checks given for deposits were drawn on the Branch Banking Trust Company, New Bern, N.C. and, on 5 August, 1944, the defendant had on deposit in said Bank the sum of $11,717.56, when he notified the Bank as follows: *Page 488 
 "New Bern, N.C. August 5, 1944.
"Branch Banking Trust Company New Bern, N.C.
"Gentlemen:
"Until further notice please do not pay any of my checks presented at the bank but advise the holders that I desire these items presented at my office for payment.
"These instructions do not refer to any of my checks which you may receive in the mails.
 Yours very truly, (Signed) Roderick Davenport."
The defendant Davenport's account was closed at the above Bank 17 August, 1944.
16. The evidence tends to show that after Davenport instructed the Bank not to pay any checks presented, except those received through the mails, he and his managers and employees continued to accept deposits and give checks on said Bank and to assure depositors the checks were good and payable on presentation. Such checks were issued covering deposits as follows:
(a) At the Rocky Mount Store, deposits in the sum of $11,850.00 were accepted after 5 August, 1944, and of these deposits $6,810.00 were received and checks issued therefor on the above Bank after Davenport's account was closed.
(b) At the Greenville Store, deposits in the sum of $16,181.50 were accepted after 5 August, 1944, and of these deposits $7,495.00 were received and checks issued therefor on the above Bank after Davenport account was closed.
(c) At the Goldsboro Stores, deposits in the sum of $31,079.20 were accepted after 5 August, 1944, and of these deposits $12,945.50 were received and checks issued therefor on the above Bank after Davenport's account was closed.
(d) At the Kinston Stores, deposits in the sum of $25,933.00 were accepted, after 5 August, 1944, and of these deposits $7,380.00 were received and checks issued therefor on the above Bank after Davenport's account was closed.
(e) The evidence does not disclose what deposits were accepted in the New Bern Stores, and in Davenport's office after 5 August, 1944.
17. According to the testimony of an official of the Branch Banking 
Trust Company, New Bern, N.C. Davenport drew out of said Bank on checks drawn payable to cash, the sum of $24,400.00 between 3 July *Page 489 
and 8 August, 1944. It also appears from the testimony of this witness that checks aggregating many thousands of dollars were presented to the Bank for payment after the defendant, Davenport's, account had been closed. A large number of checks presented were issued by Davenport and his managers and employees after the account was closed. Many of these checks were identified and introduced in evidence. There is also evidence tending to show Davenport at one time sent two apple baskets filled with money to an unknown destination.
18. The evidence tends to show that the usual commission paid under the Davenport System, to solicitors for obtaining deposits was $5.00 for $50.00 up to $100.00; $10.00 from $100.00 to $200.00; $15.00 from $200.00 to $300.00, "and right on up until it got to $1,000.00 deposit for which was paid $50.00." Some solicitors were paid a salary and commission. Others were paid 10% commission on deposits secured. There is also evidence tending to show that some depositors were paid 10% per week interest on their deposits. About 15 August, 1944, the interest payments made to depositors in New Bern were reduced to 1% per week. Many depositors were never paid any interest.
19. The defendant Davenport offered many witnesses who testified to his good character. He testified that he was solvent and met all his obligations until his business was closed by the State. That he had never changed any records and had not authorized anyone else to do so. He had never purchased any whiskey or given any whiskey away in connection with his business. He had never stated to anyone that he was bonded or that his loans were insured; and had not authorized Mr. Boyles, Mr. Whorton, or any of the young ladies working for him to do so. That he had books showing the names of those who loaned him money and these books were in his office in New Bern when he was arrested, but "they are not here today." He further testified that he signed thousands of checks in blank and his managers and employees were authorized to fill out the checks when loans were made to him and to deliver a check for each loan. He denied that the checks were intended to be payable at the Bank but he testified they were notes and that he had an understanding with his customers that the checks were not to be presented to the bank for payment but were to be presented at his office or stores. That on 1 August, 1944, he had on deposit in banks approximately $85,000.00 and $30,000.00 in cash in his New Bern store. He tried at all times to keep 80% of what he had borrowed loaned out. On 31 August, 1944, he had notes payable and outstanding in the form of checks totaling only $151,092.62, on which he was paying 5% per week. That he had notes receivable in the form of checks given him by his borrowers totaling $241,479.00, drawing interest at 10% per week. That if all his records were available they would show he was operating *Page 490 
his fruit produce business and his loan operations at a profit at the time he was arrested and his business closed.
Motions for judgment as of nonsuit on each count in both bills were made at the close of the State's evidence and renewed at the close of all the evidence. Motions overruled and the defendant, Davenport, excepted.
Verdict: "The defendant Roderick Davenport is guilty on both counts in Bill No. 2397 and is guilty on both counts in Bill No. 2403."
Judgment: "In Bill No. 2403, on the conspiracy count, the judgment of the Court is that the defendant, Roderick Davenport, be confined to the State's Prison not less than two years nor more than three years; and on the false pretense count in Bill No. 2403: The defendant is sentenced to State's Prison not less than three nor more than four years, sentence to run consecutively with the sentence in the conspiracy count.
"In Bill No. 2397, the judgment of the Court is that the defendant, Roderick Davenport, is sentenced to State's Prison on the conspiracy count for a term of three years to begin at the expiration of sentence in No. 2403. On the false pretense count in Bill No. 2397, defendant is sentenced to State's Prison for three years, sentence to begin at expiration of sentence in conspiracy count in Bill No. 2397. The Prison sentence in both counts under Bill No. 2397 to be suspended upon condition that the defendant pay the entire cost of this action."
From the foregoing judgment, the defendant, Davenport, appeals to the Supreme Court, assigning error.
We shall first consider the exceptions to the refusal of his Honor to sustain the motions to quash the bills of indictment.
Notwithstanding the various grounds advanced for quashing these bills, the motions in fact point out but two alleged defects in them: (1) That the bills do not set out in the first count the plan, scheme or contrivance by which the conspiracy was to be executed; and (2) that the indictments do not allege any offense against the criminal laws of the State.
A bill of indictment, charging "a conspiracy to cheat and defraud need not charge the means to be used" in the execution of the conspiracy, S. v.Howard — Gold Brick Case, 129 N.C. 584, at p. 657, 40 S.E. 71. S.v. Brady, 107 N.C. 822, 12 S.E. 325; 11 Am. Jur., 564. And we do not concur in the view that the bills of indictment under consideration do not charge a violation of the criminal laws of the State. In the first count of the bills, the defendants named therein are charged with a *Page 491 
conspiracy to obtain money from the public in general and certain individuals in particular by means of false pretenses, contrary to the form of the statute in such case made and provided. In the second count of each bill it is charged that the defendants in pursuance and furtherance of said conspiracy made false and fraudulent representations, knowing them to be false, and made such false and fraudulent representations with the intent to cheat and defraud certain individuals, naming them, and various and sundry others, and as a consequences of said false and fraudulent statements, which were intended to deceive and did deceive said individuals and various and sundry others, the defendants did obtain certain sums of money, the property of the named individuals, and did unlawfully obtain from various and sundry others large sums of lawful money, their property, with intent then and there to defraud, contrary to the form of the statute in such case made and provided.
The allegations contained in the second count in these respective bills of indictment are sufficient to charge a violation of the statute, G.S.,14-100. Among other things, it is provided in this statute: "That it shall be sufficient in any indictment for obtaining . . . property by false pretenses to allege that the party accused did the act with intent to defraud, without alleging an intent to defraud any particular person, and without alleging any ownership of the chattel, money or valuable security; and, on the trial of any such indictment, it shall not be necessary to prove an intent to defraud any particular person, but it shall be sufficient to prove that the party accused did the act charged with an intent to defraud."
The action of the court below in overruling the motions to quash must be upheld under our decisions, among which we cite S. v. Abernethy,220 N.C. 226, 17 S.E.2d 25; S. v. Howley, 220 N.C. 113,16 S.E.2d 705; S. v. Dale, 218 N.C. 625, 12 S.E.2d 556, and S. v. Lea,203 N.C. 13, 164 S.E. 737. In the last cited case, Stacy, C. J., in speaking for the Court, said: "The statute, C. S., 4623 (G.S., 15-153), provides against quashal for mere informality or refinement, and judgments are no longer stayed or reversed for non-essential or minor defects. C. S., 4625 (G.S., 15-155); S. v. Beal, 199 N.C. 278, 154 S.E. 604. The modern tendency is against technical objections which do not affect the merits of the case. S. v. Hardee, 192 N.C. 533, 135 S.E. 345; Rudd v. CasualtyCo., 202 N.C. 779 (164 S.E. 345). If the bill or proceeding contain sufficient matter to enable the court to proceed to judgment, the motion to quash for redundancy or inartificiality in statement is addressed to the sound discretion of the court. S. v. Knotts, supra (168 N.C. 173,83 S.E. 972). There was no error in refusing to quash the indictments on the grounds of duplicity and indefiniteness. S. v. Beal, supra." Also, in S. v.Howley, supra, Winborne, J., in speaking for the Court, said: "In our criminal procedure it is provided by *Page 492 
statute, C. S., 4623 (G.S., 15-153), that every criminal indictment is sufficient in form if it express the charge against the defendant in a plain, intelligible and explicit manner, and that the indictment shall not be quashed nor the judgment thereon stayed by reason of any informality or refinement, if in the bill sufficient matter appears to enable the court to proceed to judgment," citing numerous authorities.
When these bills of indictment are tested by the principles laid down in the above decisions, we hold them to be sufficient to withstand the motions to quash.
The Defendant Davenport assigns as error the refusal of his Honor to allow his challenge for cause, of H. L. Elks, a juror in the trial below. Mr. Elks was called as a juror after the defendant had exhausted all his peremptory challenges. In response to a question by counsel for the defendant, Davenport, Mr. Elks stated that from what he had seen in the papers it would require evidence to remove his opinion or impression against the defendant, Davenport. Upon further questioning by the Solicitor, he stated that he could give Davenport a fair trial "if he pleads not guilty." Whereupon the court propounded the following question: "Are you certain that you can sit there and try the case on the evidence as it shall develop during the trial, and the charge of the Court and the argument of counsel and render a fair and impartial verdict, despite anything you may have heard or read?" Mr. Elks replied, "I'll give him a fair trial; Yes, sir, I could do that." The challenge was thereupon overruled.
It is provided by statute, G.S., 9-14, that the judge "shall decide all questions as to the competency of jurors," and his rulings thereon are final and "not subject to review on appeal unless accompanied by some imputed error of law," S. v. DeGraffenreid, 224 N.C. 517,31 S.E.2d 523. The exception to the ruling of the court below in denying the defendant's challenge for cause, in view of the statement of the juror that he could render a fair and impartial verdict despite anything that he might have heard or read, presents no reviewable question of law. S. v. Lord,225 N.C. 354, 34 S.E.2d 205; S. v. Dixon, 215 N.C. 438,2 S.E.2d 371; S. v. Bailey, 179 N.C. 724, 102 S.E. 406; S. v. Terry,173 N.C. 761, 92 S.E. 154; S. v. Foster, 172 N.C. 960, 90 S.E. 785; S. v.Banner, 149 N.C. 519, 63 S.E. 84; S. v. Bohanon, 142 N.C. 695,55 S.E. 797; S. v. Potts, 100 N.C. 457, 6 S.E. 657.
The appealing defendant assigns as error the refusal of his Honor to sustain his motions for judgments as of nonsuit as to each count in both bills, interposed at the close of the State's evidence and renewed at the close of all the evidence.
The defendant devotes 93 pages of his brief to a discussion of these motions. It is well settled with us that in passing upon a motion for judgment as of nonsuit in criminal prosecutions, the evidence must be *Page 493 
considered in the light most favorable to the State; and when so considered, if there is more than a scintilla of competent evidence to support the allegations in the warrant or bill of indictment, it is the duty of the court to overrule the motion and to submit the case to the jury. Moreover, on such motion, the State is entitled to the benefit of every reasonable inference which may be fairly drawn from the evidence. S.v. Gordon, 225 N.C. 757, 36 S.E.2d 143; S. v. Scoggins, 225 N.C. 71,33 S.E.2d 473; S. v. Herndon, 223 N.C. 208, 25 S.E.2d 611;S. v. McKinnon, 223 N.C. 160, 25 S.E.2d 606; S. v. Johnson,220 N.C. 773, 18 S.E.2d 358; S. v. Mann, 219 N.C. 212,13 S.E.2d 247; S. v. Brown, 218 N.C. 415, 11 S.E.2d 321; S. v. Landin,209 N.C. 20, 182 S.E. 689.
The defendant concedes the correctness of the rule as stated above, but insists that since the State must prove beyond a reasonable doubt the essential elements necessary to constitute the crime of false pretense, a failure of proof as to any one or more of the elements requires the entry of a judgment as of nonsuit. To be sure the court below in passing upon these motions should have sustained them unless there was some competent evidence before him, when considered in the light most favorable to the State, which tended to support the essential allegations in the bills to which the respective motions were directed. A trial judge, however, in passing upon such motions, under the provisions of G.S., 15-173, is not bound by the measure or quantum, of proof by which the State must prove a defendant's guilt before the jury can convict him. Stacy, C. J., in speaking for the Court in S. v. Adams, 213 N.C. 243, 195 S.E. 822, stated the general rule as follows: "If there is any evidence tending to prove the fact in issue, or which reasonably conduces to its conclusion as a fairly logical and legitimate deduction, and not merely such as raises a suspicion or conjecture in regard to it, the case should be submitted to the jury; otherwise not, for, short of this, the judge should direct a nonsuit or an acquittal in a criminal prosecution. S. v. Vinson,63 N.C. 335. But if the evidence warrant a reasonable inference of the fact in issue, it is for the jury to say whether they are convinced beyond a reasonable doubt of such fact, the fact of guilt. S. v. McLeod,198 N.C. 649 (152 S.E. 895); S. v. Blackwelder, 182 N.C. 899,109 S.E. 644."
The two cases under the separate bills of indictment, were consolidated for the purpose of trial. Hence, we shall treat these bills as one, and the counts contained in the two bills as if separate counts in one bill, for such was the legal effect of the order of consolidation.
The appealing defendant and certain other individuals are charged with conspiring to commit a felony. "A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme — the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful *Page 494 
way or by unlawful means." S. v. Whiteside, 204 N.C. 710, 169 S.E. 711;S. v. Lea, supra; S. v. Ritter, 197 N.C. 113, 147 S.E. 733. No overt act is necessary to complete the crime of conspiracy. "The conspiracy is the crime and not its execution," S. v. Whiteside, supra, S. v. Shipman,202 N.C. 518, 163 S.E. 657; S. v. Wrenn, 198 N.C. 260,151 S.E. 261; S. v. Brady, supra; 15 C. J. S., 1059.
Furthermore, it is not necessary to join all the known members of a conspiracy in one bill of indictment. Each conspirator may be tried separately, if it appears upon the face of the bill of indictment that there was another with whom the defendant conspired. 11 Am. Jur., 562; 15 C. J. S., 1060. The co-conspirators may be named in the bill or alleged to be unknown. S. v. Abernethy, supra.
In proving a conspiracy, it is not necessary to establish the acts charged by direct proof. "It is not necessary to prove that the defendants came together and actually agreed upon the unlawful purpose and its pursuit by common means." 11 Am. Jur., 570. Direct proof of a conspiracy is rarely obtainable. It is said in S. v. Whiteside, supra: "It may be, and generally is, established by a number of indefinite acts, each of which, standing alone, might have little weight, but, taken collectively, they point unerringly to the existence of a conspiracy. S. v. Wrenn, supra. When resorted to by adroit and crafty persons, the presence of a common design often becomes exceedingly difficult to detect. Indeed, the more skillful and cunning the accused, the less plainly defined are the badges which usually denote their real purpose. Under such conditions, the results accomplished, the divergence of those results from the course which would ordinarily be expected, the situation of the parties and their antecedent relations to each other, together with the surrounding circumstances, and the inferences legitimately deducible therefrom, furnish, in the absence of direct proof, and often in the teeth of positive testimony to the contrary, ample ground for concluding that a conspiracy exists. 5 R. C. L. 1088." S.v. Lea, supra; S. v. Shipman, supra.
It may be conceded that one conspirator was the original instigator of the unlawful plan or purpose; and may have more or less dominated his co-conspirators, nevertheless all who knowingly participate in the execution of the unlawful purpose are equally guilty. "When a conspiracy is established, everything said, written, or done by any of the conspirators in execution or furtherance of the common purpose is deemed to have been said, done or written by every one of them, and may be proved against each. It is immaterial when a defendant entered into or became a party to the conspiracy, or how prominent or inconspicuous a part he took in the execution of the unlawful purpose; he is responsible to the fullest extent for everything that is said and done pursuant to the plot." 11 Am. Jur., 571. *Page 495 
The crime charged in the second count of the bills consolidated herein, is that of obtaining property by false pretenses. The crime of false pretense is statutory, G.S., 14-100. The essential elements which the State must prove to the satisfaction of the jury beyond a reasonable doubt, in order to convict one of the crime of false pretense, are set forth in the opinion of Reade, J., in S. v. Phifer, 65 N.C. 321, as follows: "We state the rule to be, that a false representation of a subsisting fact, calculated to deceive, and which does deceive, and is intended to deceive, whether the representation be in writing, or in words, or in acts, by which one man obtains value from another, without compensation is a false pretense, indictable under our statute." It is stated in the case of S. v.Howley, supra: "The constituent elements of false pretense as defined by the statute, and expressed in the Phifer case, supra, have been repeated without variation in numerous decisions of this Court, among which are: S.v. Dixon, 101 N.C. 741, 7 S.E. 870; S. v. Mangum, 116 N.C. 998,21 S.E. 189; S. v. Matthews, 121 N.C. 604, 28 S.E. 469; S. v. Whedbee,152 N.C. 770, 67 S.E. 60; S. v. Claudius, 164 N.C. 521, 80 S.E. 261; S.v. Carlson, 171 N.C. 818, 89 S.E. 30; S. v. Roberts, 189 N.C. 93,126 S.E. 161."
The defendant contends that since he was indicted with C. T. Jones, Johnnie Heath and J. R. Hunning, in bill No. 2397; and Jones died after the indictment was returned and before the trial, and the State took a nol.pros. as to Heath and Hunning during the progress of the trial; he is entitled to a nonsuit on both counts on the ground that Davenport could not conspire with himself and no one was left in the case with whom he could have conspired. We do not so hold. The identical point raised here was decided in the case of S. v. Alridge, 206 N.C. 850, 175, S.E., 191, in which the Court said: "The defendant, Lloyd Alridge, contends that he cannot be convicted of conspiracy because the defendant cannot conspire with himself, and as the State accepted Ed Alridge's plea of guilty of assault, but not guilty of conspiracy, and as the jury acquitted Clarence Alridge, and as Wes Buchanan was dead, there was no one left in the case for him to conspire with. However, the bill charges that Lloyd Alridge conspired with Wes Buchanan. The fact that Buchanan was dead at the time of the trial had no effect upon the unlawful conspiracy if such had been entered into between him and defendant during his lifetime, and before the crime was committed. This point is decided against the contention of defendant in S. v. Diggs, 181 N.C. 550, 106 S.E. 834. See, also, S. v.Turner, 119 N.C. 841, 25 S.E. 810." 15 C. J. S., 1060.
We deem it unnecessary to discuss the legal status of Heath and Hunning after the State took a nol. pros. as to them, since the evidence on this record tends to incriminate Jones and is sufficient to have carried the case to the jury as to Davenport and Jones on the charges contained *Page 496 
in the bill, had Jones been alive at the time of the trial. It is disclosed by the evidence that Jones was the manager of Davenport's Greenville Store. He received deposits and made loans. The store took in over $21,000.00 in deposits prior to his resignation as manager, 25 August, 1944. When demand was made on him for the withdrawal of at least one deposit, he informed the depositor he had loaned out her money and had no funds available for the payment of her check, which had been issued by the Greenville Store 11 August, 1944. The evidence also shows, according to the State's Exhibit No. 269, that between 11 August and 25 August, 1944, this store received in deposits $9,271.50 and during the same period loaned out only $966.50. On 22 August, 1944, according to the evidence of the State and the defendant Davenport, Jones accepted for deposit the check of F. O. Muth in the sum of $1,900.00, which check Davenport had received from Muth and issued therefor a check for $1,900.00 on the Branch Banking Trust Co., New Bern, N.C. a bank in which he had no account. Jones, as manager of the Greenville Store, deposited the Muth check in the Guaranty Bank Trust Company, Greenville, N.C. and on 25 August, 1944, he issued a check in the name of Dixie Produce Co., by C. T. Jones, payable to cash for the entire sum of $1,900.00, and applied it on indebtedness to himself which he claimed Davenport owed him. This contention of the defendant cannot be sustained.
The defendant also contends that no one was misled by his statements or his advertisements to the effect that he was solvent, and his business had been investigated and found to be legal. He contends the truth or falsity of those statements is a matter of law, and says in his brief: "The aphorism, `There are none so blind as those who will not see,' applies here with full force and vigor, and it is argued that this blindness was caused solely by the dazzling light of 260 percentum per annum, and by no other consideration." We concede the Davenport Plan to be one calculated to attract those interested in quick profits. It could also be conceded that a small loan business might be operated in such a manner as to enable its operator to pay 5% interest per week by loaning the money at a higher rate of interest, if the operator could escape the penalty of our usury laws, but such a concession would bring no comfort to this defendant in view of the evidence disclosed on this record. The appealing defendant, his co-defendants, and other associates, knew they were taking in enormous sums of money, that no more than 10% of it was loaned out. They knew the produce stores were being used as a "front" for the loan business and were being operated at a loss. Moreover, according to the evidence disclosed on this record, exclusive of the New Bern Stores, the stores in Greenville, Rocky Mount, Kinston and Goldsboro received in deposits the sum of $85,643.70 and issued checks drawn on the Branch Banking Trust Co., New Bern, N.C. for those *Page 497 
deposits after Davenport had notified the Bank not to pay any of his checks drawn on that institution except those that came through the mails. Notwithstanding that fact, Davenport, his managers and other employees, in the meantime were making a concerted effort to get deposits and were assuring the depositors the checks issued to them were good and would be paid on presentation at any time. Furthermore, of the above deposits, $37,730.50 were received and Davenport and his managers and employees issued checks therefor on the Branch Banking Trust Co., New Bern, N.C. after Davenport's account had been closed at that institution.
The defendant further contends that there is no evidence to support the charges against him because he offered evidence to the effect that he paid all withdrawal checks presented to him or to the Branch Banking Trust Company, New Bern, N.C. prior to the time the representative of the State Bureau of Investigation began an examination of his loan operations. Even so, the evidence on this record tends to show that Davenport at no time during July or August, 1944, was earning sufficient income from his loan business to pay more than a small fractional part of the interest he had obligated himself to pay his depositors, even before taking into consideration the other expenses incurred in connection with the operation of his business. According to the evidence, he was operating on deposits and not earnings, and the records at each store clearly establish this fact. The contention of solvency on the part of Davenport at any time in July or August, 1944, is an absurdity in the light of the evidence as disclosed by the record.
The transcript of the evidence, exclusive of the exhibits, covers 935 pages of the record, which, including exhibits, contains, 1,613 pages. Obviously, it is not practical for us to quote all or even a substantial part of the evidence. But when the evidence on this record is tested by the principles laid down in the authorities and decisions cited herein, it is sufficient to sustain the verdict on all the counts in which this defendant is named.
It is also contended by the defendant that the conspiracy counts in the indictment, charge only a misdemeanor and as a matter of law, are merged in the felony counts. A conspiracy to commit a felony is a felony in this jurisdiction. S. v. Abernethy, supra; S. v. Dale, supra; S. v. Ritter,199 N.C. 116, 154 S.E. 62. Hence, the conspiracy counts are not merged in the felony counts as contended by the defendant. S. v. Dale, supra, and the cases cited therein.
The rulings of his Honor on the motions for judgment as of nonsuit will be upheld.
The record contains 333 assignments of error to the admission of evidence. We shall not undertake to discuss them at any great length. Most of them are so clearly without merit it is difficult to understand *Page 498 
why they were brought forward. For example, exception after exception is brought forward which challenges the admissibility of evidence admitted as to the co-defendants, after the court had instructed the jury not to consider the testimony against Davenport.
The defendant excepts to the admission of testimony by W. R. Boyles, to the effect that after Davenport was arrested he sent him to employ Mr. Jesse Jones, an Attorney at Law of Kinston, N.C. to represent him. The witness testified he informed Mr. Jones that Davenport was going to "open more stores to get money to pay off down yonder." The proffered employment was declined.
Mr. Jones was called as a witness and his testimony was offered only in corroboration of Boyle's testimony. Mr. Jones testified that Boyles told him Davenport was going to open stores in Wilson and Smithfield to get money to pay off the people he owed in New Bern and Kinston. Whereupon he inquired how Davenport was going to get the money to pay the people in Smithfield and Wilson. Boyles said "he did not know." Then he said "he was going to get the money on the representation that he was going to loan it out." The witness testified that he told Boyles, "Under your own statement, if that is what he is going to do he would be guilty of obtaining money under false pretenses." This evidence is attacked on two grounds: (1) That it was a privileged communication arising out of the relationship of attorney and client; and (2) That it was an expert opinion to the effect that Davenport was guilty of conspiracy to defraud by false pretense and invaded the province of the jury.
The rule governing communications between attorney and client is stated in Stansbury on Evidence, Sec. 2, p. 108, et seq., the pertinent parts of which read as follows: "The relation of an attorney and client must have existed at the time of the disclosure. Thus there is no privilege when the relation had not begun, or the attorney had refused employment, or the relation had terminated. . . . Although the attorney need not have been consulted with a view to actual litigation, the communication must have been made in the course of seeking legal advice for a proper purpose; hence, no privilege exists where advice is sought in aid of a contemplated violation of law," citing S. v. Smith, 138 N.C. 700, 50 S.E. 859;Eekhout v. Cole, 135 N.C. 583, 47 S.E. 655; and Hughes v. Boone,102 N.C. 137, 9 S.E. 286.
The relationship of attorney and client did not exist between the witness and Davenport at the time the conference took place. Consequently, the first ground of objection cannot be sustained.
The second ground upon which the defendant challenges the admissibility of the evidence is likewise untenable, since the court excluded that portion of the evidence as to Davenport which constituted an opinion based on the statement made to Mr. Jones by Boyles. *Page 499 
There are numerous exceptions to the admission of evidence as to confessions made by several of the co-conspirators. These confessions were made in the absence of Davenport, and some of them contained statements purported to have been made by him.
On motion of counsel for Davenport, such confessions were ordered stricken from the record and the jury was instructed not to consider any statements made in the absence of the defendant, Davenport, by the defendants Whorton, Boyles, Powers, Heath, Hunning, or any other person out of court and prior to the time the witnesses were examined and testified in the trial of this cause. The court having ruled with the defendant on his motion to pursue this course, he cannot now complain.
There are exceptions to practically every word of the evidence which tends to show the manner in which the Davenport System was conducted, the advertisements carried in the papers, the books and records introduced in evidence, or as to the statements made by Davenport, his managers and employees to depositors as an inducement to get them to deposit their money.
The acts and declarations of each conspirator are admissible against every other member of the conspiracy. S. v. Whiteside, supra; S. v. Ritter,supra (197 N.C. 113, 147 S.E. 733); 11 Am. Jur., 571. Evidence as to the manner in which the business of Davenport was conducted, the statements made as an inducement to secure deposits, the assurance given of the solvency and the legality of the defendant's loan business, the destruction and alteration of records, was competent as tending to establish a conspiracy. S. v. Whiteside, supra.
We have carefully examined all the exceptions to the admission of evidence, and they present no prejudicial error.
Exceptions are taken to certain remarks made by the trial judge during the course of the trial below.
We find nothing in the remarks of his Honor made in the course of the trial below, that lends support to the contentions of the defendant. The remarks were no more than were necessary and proper in a trial of this length. The court merely suggested from time to time that witnesses had already testified to certain matters and it was unnecessary for them to go over their testimony again and again. The remarks complained of were clearly made by the court in an effort to expedite the trial. But no one can read this record without being impressed with the fairness and patience of his Honor in the trial of this case.
We have thirty-eight assignments of error challenging the correctness of the charge of the court. A detailed consideration of them would serve no useful purpose. Exceptions are taken to the statement of contentions. An exception is taken to the preponderance of space and time given to the State's contentions, in comparison to that given the contentions of the defendant. Exception is also taken to the court's statement *Page 500 
of the State's evidence, which the defendant contends constitutes, in effect, an opinion on the part of the court adverse to defendant. These exceptions cannot be sustained.
The record shows that the trial judge inquired of counsel for the defendant and of the solicitor, at the close of his statement of the evidence, as to whether or not he should state the evidence more fully than he had already done. Counsel for the State and for the defendant assured his Honor it was not their desire for him to recapitulate the evidence further. Moreover, counsel for defendant requested the court to give a number of additional contentions for the defendant, which were given as requested.
The charge is in substantial accord with our decisions on the questions presented by the exceptions, and is free from prejudicial error.
It has been a laborious and tedious task to review the record on this appeal, which contains 440 assignments of error and over 1,700 exceptions. We have carefully considered all the assignments of error brought forward and argued in the defendant's brief, but we have of necessity discussed only those questions raised by the exceptions that we felt warranted discussion.
The manner in which the able solicitor performed his duties in the preparation and trial of this case, is highly commendable. The excellent judge who presided at the trial below, which lasted for five weeks, was careful and painstaking in the discharge of his duties, and the record supports the conclusion that no prejudicial error was committed in the trial below.
No error.