For the reasons stated, we think there must be a

New trial.

CAMPBELL and BRITT, JJ., concur.

———————

STATE OF NORTH CAROLINA v. MARGARET RUTH HORTON

No. 6922SC147

(Filed 18 June 1969)

**1. Criminal Law § 104—    motion to nonsuit — consideration of evidence — scintilla rule**

Upon motion to nonsuit, the evidence must be considered in the light most favorable to the State; and when so considered, if there is more than a scintilla of competent evidence to support the allegations in the warrant or bill of indictment, it is the duty of the court to overrule the motion and to submit the case to the jury.

**2. Criminal Law § 104—    motion to nonsuit — consideration of evidence**

On motion to nonsuit, the State is entitled to the benefit of every reasonable inference which may be fairly drawn from the evidence.

**3. Conspiracy § 3—    criminal conspiracy defined**

A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme — the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way by unlawful means.

**4. Conspiracy § 3—    conspiracy to commit a felony**

A conspiracy to commit a felony is a felony.

**5. Conspiracy § 3—    completion of agreement**

The crime of conspiracy is complete when the agreement is made.

**6. Conspiracy § 3— overt act**

It is not required that an overt act be committed before the conspiracy becomes criminal.

**7. Conspiracy § 3— prosecution of conspirators — number of defendants**

Although at least two persons are required to create a conspiracy, it is not required that more than one person be prosecuted for the offense.

**8. Conspiracy § 6— criminal conspiracy to murder husband — sufficiency of evidence — exculpatory testimony**

In a prosecution charging that femme defendant conspired with two other persons to murder her husband, which conspiracy was abortive, defendant's motion for nonsuit was properly denied, notwithstanding that much of the co-conspirators' testimony was to the effect that they had no intention of killing defendant's husband but only sought to obtain money from her, where State offered evidence that defendant asked one co-conspirator to procure someone to kill her husband for her, that defendant and the co-conspirator went to an airport to meet the other co-conspirator who had purportedly arrived from New York, that defendant paid the co-conspirators $2550 and directed them to an abandoned farm house where her husband went almost every day, and that one co-conspirator purchased bullets for his .38 pistol and testified that "I received the money for doing just what we were talking about, to kill him."

APPEAL by defendant from *Johnston, J.,* at the 21 October 1968 Criminal Session of IREDELL Superior Court.

In a bill of indictment returned by an Iredell County grand jury, defendant was charged as follows:

"* * * [T]hat Margaret Ruth Horton late of the county of Iredell, on the 6th day of May, in the year of our Lord one thousand nine hundred and sixty-seven, with force and arms, at and in the county aforesaid, and from said date up to and through the 22nd day of November, 1967, with force and arms at and in the county aforesaid, unlawfully, wilfully and feloniously, in secret and with malice, did conspire in combination agreement and union of purpose of mind with Robert Lee James, Carl Ruben Deal and person or persons unknown to the State to unlawfully, wilfully and feloniously and with malice aforethought kill and murder one Lee Roy Horton, late of the County of Iredell, now deceased; against the form of the statute in such case made and provided and against the peace and dignity of the State."

The evidence most favorable to the State tended to show: Defendant and her husband were having marital difficulties. In October 1966, Attorney Arthur S. Beckham, Jr., while standing in front of

the courthouse, overheard a conversation between defendant and her husband in which she said, "I'll see you dead and burning in hell before you'll divorce me or keep my children." Robert Lee James (James) became acquainted with defendant in January 1967 when she was working as a waitress in a restaurant. In late April 1967, defendant went to James' home and handed him a note with her telephone number on it. James called the defendant the next day and they made arrangements to meet each other on the Charlotte highway. That night between eight and nine, they rode to an old abandoned farm house owned by defendant. She told James she had been having trouble with her husband and they agreed to meet again the following night. On that occasion, defendant asked James if he knew anybody that she might get to do something to her husband. James asked her if she wanted him "beat up or roughed up"; she replied, "I want a little more than that." James told defendant he knew a man who might do something like that for defendant and she inquired as to what it would cost. James stated that he did not know but would contact the man in New York and get him to come down there. Defendant told James to contact the man, and they drove back to Statesville and stopped at a Texaco station. James made a telephone call from a pay station to Carl Deal (Deal) in Taylorsville but left the impression with defendant that he had made a call to New York. A day or two later James and defendant drove to the Charlotte airport for the purpose of meeting Deal, who was driving there from Taylorsville, but James and Deal wanted defendant to think Deal arrived on a plane from New York. James had a .38 pistol and bought some bullets for it. James introduced Deal as Joe Fratt and the three of them returned to the abandoned farm house near Statesville. Defendant asked Deal what he was going to charge her for getting the job done and he replied, "Five." She asked if he meant five hundred and Deal replied five thousand but that amount would take care of James' part. Defendant paid Deal $1250.00 that night and agreed to pay him more the next night. Defendant advised James and Deal that her husband came to the abandoned farm house practically every day and if they would wait for him at the upstairs window, they could see him arrive. She provided them with a picture of her husband but told them not to do anything to him if either of her children was with him. The next night defendant delivered an additional $1300.00 to Deal. James and Deal later scattered some cigarette butts around the upstairs window of the farm house and told defendant that they had waited many hours for her husband but he did not arrive. Deal returned to Taylorsville and neither Deal nor James did any harm to defendant's

husband. Several days later, defendant saw James and said, "You fellows took me, didn't you?" She demanded that James return her money, but he did not do so. Some five or six months later, a bombing occurred in Statesville, after which James talked with police officers about his and Deal's transactions with defendant.

Defendant offered no testimony but moved for judgment of nonsuit, contending that the evidence introduced by the State showed that there was never any intent on the part of James or Deal to harm her husband and that their only purpose was to get money from her.

Motion for nonsuit was overruled, the jury found the defendant guilty as charged, and from a prison term of not less than seven nor more than ten years, defendant appealed.

*Attorney General Robert Morgan and Deputy Attorney General, James F. Bullock for the State.*

*F. Lee Bailey and Gardner & Wilson by Rossie G. Gardner and Jerry C. Wilson for defendant appellant.*

BRITT, J.

Defendant first assigns as error the failure of the trial court to grant her motion for judgment as of nonsuit.

[1, 2] It is well settled that in passing upon a motion for judgment as of nonsuit in criminal prosecutions, the evidence must be considered in the light most favorable to the State; and when so considered, if there is more than a scintilla of competent evidence to support the allegations in the warrant or bill of indictment, it is the duty of the court to overrule the motion and to submit the case to the jury. Moreover, on such motion, the State is entitled to the benefit of every reasonable inference which may be fairly drawn from the evidence. *State v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686; *State v. Gordon,* 225 N.C. 757, 36 S.E. 2d 143; *State v. Scoggins,* 225 N.C. 71, 33 S.E. 2d 473; *State v. Herndon,* 223 N.C. 208, 25 S.E. 2d 611.

[3-6] In *State v. Gallimore,* 272 N.C. 528, 158 S.E. 2d 505, in an opinion by Higgins, J., it is said: " 'A conspiracy is the unlawful concurrence of two or more persons in a wicked scheme — the combination or agreement to do an unlawful thing or to do a lawful thing in an unlawful way by unlawful means. (Citing many cases.)' *State v. Goldberg,* 261 N.C. 181, 134 S.E. 2d 334; *State v. McCullough,* 244 N.C. 11, 92 S.E. 2d 389. A conspiracy to commit a felony is a felony. *State v. Brewer,* 258 N.C. 533, 129 S.E. 2d 262; *State v. Aber-*

*nethy,* 220 N.C. 226, 17 S.E. 2d 25. The crime is complete when the agreement is made. *State v. Davenport,* 227 N.C. 475, 42 S.E. 2d 686; *State v. Whiteside,* 204 N.C. 710, 169 S.E. 2d [sic] 711; *State v. Knotts,* 168 N.C. 173, 83 S.E. 972. Many jurisdictions follow the rule that one overt act must be committed before the conspiracy becomes criminal. Our rule does not require an overt act."

[7]    Although at least two persons are required to create a conspiracy, it is not required that more than one person be prosecuted for the offense. *State v. Gallimore, supra.*

[8]    Defendant strenuously contends that the State's case depended primarily upon the testimony of Robert Lee James and Carl Deal, they being named in the indictment as defendant's co-conspirators; that the testimony of James and Deal negatived the creation of a conspiracy. Specifically, defendant refers to their testimony to the effect that at no time did either of them intend to kill defendant's husband, their only purpose being to get money from the defendant.

Conceding that a large part of the testimony given by James and Deal was exculpatory, the fact remains that from their testimony there could be gleaned "more than a scintilla" of evidence to support the allegations in the bill of indictment. When James talked with Deal over the telephone soon after defendant first contacted James, James told Deal that there was a woman in Statesville that wanted to get her husband killed. Thereafter, defendant and James met Deal at the airport in Charlotte. James had a .38 caliber pistol for which he purchased some bullets. In response to a direct question as to what he received the money for, James replied, "I received the money for doing just what we were talking about, to kill him."

In their testimony, James and Deal stated that at no time did they have any intention of killing the defendant's husband. The conversations and transactions between the defendant, James and Deal occurred during late April and early May 1967; it was following a bombing some five or six months later that James talked with the solicitor and police officers. The State contends that it is reasonable to infer that James and Deal "changed their tune" between the time they had the conversations and agreement with the defendant and the time of their conversations with law enforcement officers five or six months later and that it was for the jury to determine where the truth lay.

We have not attempted to recapitulate all of the pertinent testimony but hold that the evidence presented at trial was sufficient to withstand the motions for nonsuit. The assignment of error relating thereto is overruled.

The only other assignment of error brought forward and discussed in defendant's brief relates to the trial judge's instructions to the jury. We have carefully considered the instructions given and conclude that when they are considered contextually they are free from prejudicial error. The assignment of error is overruled.

The defendant received a fair trial, free from prejudicial error.

No error.

MALLARD, C.J., and PARKER, J., concur.