STATE v. RAY HELSABECK.

(Filed 21 November 1962.)

1. **Embezzlement § 6— Evidence held sufficient to overrule nonsuit in this prosecution for embezzlement.**

   The State's evidence tended to show that defendant, in negotiating for the sale of a house as broker, entered into a verbal contract with the purchaser under which the purchaser was to pay him the monthly payments on the mortgage assumed by the purchaser and the broker was to turn over the sums monthly to the mortgagee until such time as the mortgagee should accept the assumption of the debt by the purchaser, and that the purchaser made seven such monthly payments to the broker but that the broker made only four monthly payments to the mortgagee, and converted to his own use the proceeds of the other three payments. *Held:* The evidence is sufficient to be submitted to the jury in a prosecution for embezzlement, since it tends to show that the broker, as agent and while acting in a fiduciary capacity, fraudulenly embezzled and converted to his own use monies which the purchaser entrusted to him to pay to the mortgagee. G.S. 14-90.

2. **Same—**

   Fraudulent intent, constituting a necessary element of embezzlement, may be shown by direct evidence or by evidence of facts and circumstances from which it may be reasonably inferred.

APPEAL by defendant from *Fountain, S.J.,* 28 May 1962 Criminal Term of FORSYTH.

Criminal prosecution upon an indictment charging that defendant, Ray Helsabeck, being "the agent, bailee, consignee, clerk, employee

and servant of one Thomas D. Kempton" did feloniously embezzle $269.70 in money entrusted to him by Thomas D. Kempton. G.S. 14-90.

Plea: Not Guilty. Verdict: Guilty as charged.

From a judgment of imprisonment, suspended by the court with defendant's consent on condition that he make restitution and on other conditions, defendant appeals.

*Attorney General T. W. Bruton and Assistant Attorney General Harry W. McGalliard for the State.*

· *Emanuel & Emanuel by J. L. Emanuel for defendant appellant.*

PARKER, J. Defendant's sole assignment of error carried forward and discussed in his brief is to the denial of his motion for judgment of nonsuit made at the close of all the evidence: the State and the defendant introduced evidence.

This is a summary of the State's evidence:

Thomas D. Kempton, an associate engineer with Western Electric Company in the city of Winston-Salem and a married man of very little business experience, who had never owned any real estate, was desirous in the fall of 1960 of purchasing a home in the city. Ray Helsabeck is a licensed real estate broker in Winston-Salem. On 20 December 1960 Kempton entered into negotiations with defendant to purchase a house situate at 1237 Peachtree Street in the city of Winston-Salem owned by Mrs. Elizabeth H. Willard, a daughter of defendant, who at that time was a resident of Ohio. This Willard house at the time was burdened with a deed of trust securing an indebtedness in the sum of $10,062.00 in favor of the Prudential Insurance Company, payable in monthly installments of $89.90. The negotiations terminated in a verbal contract of purchase and sale as follows: Kempton was to pay defendant a down payment of $900.00 in cash and give him a $1,200.00 promissory note, for Mrs. Willard's equity of redemption in the property, and he was to receive a deed for the property, and he and his wife were to assume the payment of the secured debt to the Insurance Company. That until the Insurance Company agreed that he and his wife could assume its secured debt, he was to make out monthly cheques for $89.90 payable to defendant, and defendant would use the proceeds of the cheques to pay to the Insurance Company the monthly installments due. In December 1960 Kempton borrowed $900.00, and gave it to defendant, and also a promissory note for $1,289.47. On 30 December 1960 defendant gave Kempton his promissory note reading: "Three years after date I promise to pay to the order of Thomas D. Kempton nine hundred and 00/100 dollars at $29.59 per month, Wachovia Bank & Trust Company." Thereafter, Kempton and his wife moved into the Willard house, and lived in it about seven months.

STATE *v.* HELSABECK.

On 5 January 1960 (it seems this is a manifest error and should be 1961), on 1 February 1961, on 7 March 1961, on 5 April 1961, on 12 May 1961, on 13 June 1961, and on 10 July 1961 Kempton delivered to defendant his cheques payable to the order of Ray Helsabeck in the sum of $89.90 each, and drawn on Wachovia Bank & Trust Company, Winston-Salem, North Carolina, except that the February cheque has as payees Ray Helsabeck, Carolina Realty Company. The May, June, and July cheques have on their face: "For: House payment to Prudential Ins. Co." The January, February, March, April and June cheques were endorsed "Ray Helsabeck—Carolina Realty Co.", and the May and July cheques were endorsed "Ray Helsabeck." All these cheques were paid upon presentation by the payee bank.

In May 1961 defendant came to Kempton's home, and delivered a deed from Mrs. Elizabeth H. Willard, and husband, to Thomas D. Kempton, and wife, for the property at 1237 Peachtree Street. At that time defendant told Kempton and his wife: "If you record this, then this deal with the notes will have to go through as written, otherwise, at the end of the year, if we want to, we can renege, but if you put it on record, it is final." This deed executed by Mrs. Elizabeth H. Willard, and her husband, bears the date of 6 January 1961, was acknowledged by them before a notary public in Ohio on 30 January 1961, and was filed for registration in Winston-Salem on 26 September 1961. This deed is in the usual form, recites a consideration of $100.00, and other considerations, refers to no notes, and covenants that the property conveyed is free from encumbrances.

On 25 July 1961 Charles D. Ficken, a mortgage loan agent for Prudential Insurance Company, came to 1237 Peachtree Street looking for Mrs. Elizabeth H. Willard. Kempton told him he had purchased the house. Ficken told him the monthly installments on the secured debt were three months delinquent.

Helsabeck made four payments of $89.90 to Prudential Insurance Company from the proceeds of Kempton's seven cheques for $89.90 each, but did not make payments of $89.90 to the Insurance Company from the proceeds of three of Kempton's cheques in the sum of $89.90 each.

As a result of the information received in July 1961 by Thomas Kempton from Ficken that the monthly installments on the debt to Prudential Insurance Company were three months in arrears, he went the same month to George B. Kempton for advice. They were not kin. Thomas Kempton knew George B. Kempton, who has been in the real estate business in Winston-Salem for 23 years, by reason of the fact that George B. Kempton had done some building for Western Electric Company. Thomas Kempton went over his transaction with defendant

with George B. Kempton. George B. Kempton testified "the thing was very confused," and he called defendant for a conference. At this time George B. Kempton did not know Thomas Kempton had received a deed for the house. George B. Kempton testified:

"I had a conference with Mr. Kempton and defendant and Tom's wife in my office approximately in July. During that conference defendant said he had used the money from these checks; he said he would make the money good during that week.* * *I suggested to defendant that I had never seen a real estate transaction handled in this way, the man couldn't get his deed, and they had notes swapped back and forth, and I suggested to him: 'You are certainly on mighty thin ice, as far as I can see, and I think you would be wise to get this settled,' and he said, 'I agree with you thoroughly, I don't want any trouble about it and if he will just turn the papers back to me I will meet him at Wachovia Bank and pay off this $900.00 note balance that is due, and we will wash it out.' * * *so on the Thursday morning that I called the Wachovia Bank and told them they would be up there and pay this off and get the note out and to send it to the branch bank Thursday morning. Defendant never showed up. I continued trying to help Mr. Kempton, charging him nothing. I suggested defendant come out there again and he said he couldn't raise the money, that he couldn't get it and he didn't know what he was going to do. He said he would do it on Thursday, and the following Tuesday he didn't get it. * * *during the course of all this defendant told me that he had taken these checks, I said, 'Why would you take money for Prudential Insurance Company,' he said, 'I do a great deal of business with them. I will handle it and send it in.' I said, 'You haven't, though.' He said, 'No, but I am going to,' and that was the way I became involved in it, and those were the things he told me."

Charles D. Ficken testified in substance: His understanding is defendant ran Carolina Realty Company at that time. When he told Thomas Kempton the loan was in arrears, Kempton told him he had made monthly payments, but Ficken is not sure whether Kempton said he had made the payments to Carolina Realty Company or defendant. The Insurance Company foreclosed its deed of trust on 1 November 1961.

In August 1961 the North Carolina National Bank carried an account in the name of defendant or Carolina Realty Company. On 7 August 1961 there was presented to this bank a cheque for $273.26 signed by defendant for Carolina Realty Company payable to Pru-

dential Insurance Company, which was not paid by the bank by reason of insufficient funds on deposit in the bank by the drawer.

In the last of September 1961 the Kemptons moved out of the house. Defendant has never paid him back any of the cash down payment of $900.00 or any of the $89.90 monthly payments on the deed of trust debt.

This is a summary of defendant's evidence, except when quoted: As agent for his daughter Mrs. Willard, he ran an advertisement for the sale or rental of her house situate at 1237 Peachtree Street. As a consequence, he was contacted by Thomas Kempton who said he would like to buy it. He told Kempton it would take $1,287.53, which was the difference between what they owed Prudential Insurance Company and $11,900.00, and he would sell it for that amount. Or he would rent it for a year at $89.90 a month, which "was our costs per month of the payments, until he could raise this amount." Kempton gave him a cheque for $89.90 for rent of the property for January 1961, and moved into the house. Kempton said he would like to buy the property as soon as he could get the down payment. Kempton gave defendant a note for $1,287.53, saying, "I will give you a note for that amount until I can raise it, I have some money coming." He told Kempton he would transfer the property when he, Kempton, paid off the note. A few days later Kempton gave him $900.00 saying he couldn't get any more. He told Kempton he would accept that until he got the $387.53. Kempton said that if he was going to have to pay 6% interest on his note until he paid it off, he would like to have 6% interest on the $900.00 in cash he gave defendant. Defendant said he thought that was fair; he would hold the $900.00 as a down payment and pay him 6% interest. Thereafter, he went to Ohio and procured a deed for the property to Kempton, and wife, from his daughter to be delivered when he got the remainder of his money.

On 7 February 1961 Kempton told him he had $100.00, and he could pay his $89.90 monthly payment, but if he did, he wouldn't be able to make a payment on the bank note for the $900.00 he had borrowed. Whereupon, Kempton gave him a cheque for $89.90, and he refunded him the amount he had to pay on his bank note. In March, April, May and June, Kempton could only pay $60.00 a month. He told Kempton in June this had gone on long enough, instead of his getting a full month's rent of $89.90, he was only getting $60.00 a month. In July Kempton told him he wanted to see the deed, and when Kempton received it, he walked out of the office over his protest carrying the deed.

A few days later George B. Kempton called him for a conference. At the conference George B. Kempton threatened him with the loss

of his real estate license if he didn't get the payments with Prudential Insurance Company up to date. He told them if Thomas Kempton was not satisfied with the transaction, and if he would leave the house on August first, he would give him every dime he put in it, "and the $89.90 that he had paid me for rent would be considered as rent for the time that he was in it. This he agreed to do, and on the strength of that verbal agreement I mailed to Prudential a check for $273.00 and some cents, to get the property up to date." The property at that time had not been foreclosed, but the payment of the secured debt was delinquent. Kempton did not move out on August first, and he stopped payment on the cheque.

Defendant testified on cross-examination:

"This check for $273.26 was returned for insufficient funds. And Prudential wrote me a letter that it had been returned for insufficient funds and unless it was paid promptly they would have to foreclose; that was under date of August 14, 1961. They did foreclose, and I didn't pay it.

"* * *From the time Kempton was in the picture, I paid Prudential the January, February, March and April payments, being the same amount Mr. Kempton was paying me for rent, the same as the man before him paid me for rent.

"There were three payments of rent that he paid to me that were never sent to Prudential. He was to pay me $89.90 in rent. He was coming up $30.00 short of this money every month.* * *

"I signed a note promising to pay Thomas D. Kempton $900.00 three years after its date, of December 30, 1960, at 6%. The words '$29.59 per month of Wachovia Bank and Trust Company' were written in the note after February 7th, after I signed it—that is not my writing. * * *

"* * *I have a check dated February 1st for $29.59—that was the first payment I made to him, and the first month he paid me the full rent—$89.90."

Thomas Kempton, recalled as a witness after the defendant rested, testified as follows:

"I never did have a rental agreement for the property at $89.90. I had no other contract with defendant other than one of purchase. The purchase contract was not to take place when I paid $1,200; it was to take place when we exchanged the $900.00 and the promissory notes (sic)."

It is very apparent from all the evidence that Thomas D. Kempton has had very little business experience. It is also very apparent from

the evidence, whether one considers Thomas D. Kempton's version of the real estate transaction or that of defendant, that it was a strange and unusual transaction.

However that may be, considering the State's evidence in the light most favorable to it, and giving to it the benefit of all legitimate inferences to be drawn therefrom, as we are required to do in passing on defendant's motion for judgment of nonsuit, *S. v. Davenport*, 227 N.C. 475, 42 S.E. 2d 686, this seems clear: Thomas D. Kempton and defendant as agent for his daughter, Mrs. Elizabeth H. Willard, entered into a contract of purchase and sale of the house situate at 1237 Peachtree Street in Winston-Salem, that this house was burdened with a deed of trust securing an indebtedness in the sum of $10,062.00 in favor of Prudential Insurance Company, payable in monthly installments of $89.90, that Kempton was to assume the payment of the secured debt to the Insurance Company, and that until the Insurance Company agreed that Kempton and his wife could assume the payment of its secured debt, Kempton was to make out monthly cheques for $89.90 payable to defendant, and defendant would use the proceeds of these cheques to pay to the Insurance Company the monthly installments due. That Kempton in January, February, March, April, May, June, and July 1961 gave defendant cheques for $89.90 each, which were paid by the bank upon which they were drawn to defendant, and that defendant used the proceeds from four of these cheques to pay the monthly installments to the Insurance Company, and used the proceeds from the last three cheques for his own purposes. George B. Kempton testified that defendant at the conference in his office said "he had used the money from these checks; he said he would make the money good during that week." Defendant never did. Later Prudential Insurance Company foreclosed its deed of trust because the monthly installments due were in arrears.

The State's evidence would permit and support a jury's finding of these four distinct propositions of fact: One. Defendant was the agent of Thomas D. Kempton, and charged with the duty of receiving from his principal in his fiduciary capacity, and paying over to Prudential Insurance Company, on the secured debt owned by it on the house defendant sold Kempton and his wife, seven monthly installment payments of $89.90 each. Two. That he did in fact receive such money amounting to $629.30. Three. That he received this money in the course of his employment and by virtue of his fiduciary relationship with Thomas D. Kempton. And Four. Defendant knowing this money was not his own fraudulently embezzled and converted the last three of these payments of $89.90 each, amounting to $269.70, entrusted to him in his fiduciary relationship by Kempton, to his own use.

The establishment by the State of these four elements is sufficient to constitute the felony of embezzlement under the statute and decisions of this State. G.S. 14-90; *S. v. Blackley,* 138 N.C. 620, 50 S.E. 310; *S. v. Eubanks,* 194 N.C. 319, 139 S.E. 451; *S. v. Gentry,* 228 N.C. 643, 46 S.E. 2d 863; *S. v. Block,* 245 N.C. 661, 97 S.E. 2d 243.

The fraudulent intent within the meaning of G.S. 14-90 "may be shown by direct evidence, or by evidence of facts and circumstances from which it may reasonably be inferred." *S. v. McLean,* 209 N.C. 38, 182 S.E. 700.

Defendant's motion for judgment of nonsuit made at the close of all the evidence was properly overruled.

Affirmed.