STATE OF NORTH CAROLINA v. BETTY AGNEW

No. 762SC894

(Filed 6 July 1977)

1. **False Pretense § 3.1— fraudulent representation — insufficiency of evidence**

The State's evidence was insufficient for the jury in a prosecution of the director of a county Department of Social Services for obtaining money from the county by false pretense where it tended to show that defendant received an advance for expenses for a business trip from a revolving fund of the Department of Social Services, defendant was personally responsible for repayment of the advance, defendant submitted a claim to the county treasurer for reimbursement for the expenses of the trip and was reimbursed by the county treasurer for such expenses, and defendant failed to repay the advance from the revolving account of the Department of Social Services until after an audit of that account was begun, since defendant's request to the county was not to collect twice for the same expenditures and was not a fraudulent representation.

2. **Embezzlement § 6— insufficiency of evidence**

The State's evidence was insufficient for the jury in a prosecution of the director of a county Department of Social Services for embezzlement in violation of G.S. 14-90 where it tended to show that defendant received travel advances of $1,314.64 from a revolving account over a period of less than a year, the revolving account consisted of cash on hand and on deposit, defendant was the custodian of the funds in the revolving account, when advances were repaid they were held as cash on hand or on deposit, records of cash transactions were evidenced by control cards, defendant gave another employee $900.00 on 20 July 1975 to repay advances, this amount was not deposited in the revolving account but was given to the county accountant in payment of several accounts, defendant had in her possession in the Department of Social Services the sum of $414.64 on 15 August 1975 after an audit was commenced, and the $414.64 was deposited in the revolving account on 29 September 1975 after the audit was completed, since, if it be conceded that there was an appropriation or conversion, the evidence was insufficient to show a fraudulent purpose or corrupt intent.

3. **Embezzlement § 6— misapplication of county funds — insufficiency of evidence**

   The State's evidence was insufficient for the jury in a prosecution of the director of a county Department of Social Services for the willful and corrupt misapplication of county funds in violation of G.S. 14-92 where it tended to show only that funds were expended for a punch bowl, a coffee pot, a refrigerator, cakes, pies, gifts for members of the Board of Social Services, and an advance to an employee for vacation expenses and rent, but the State failed to identify the funds expended as those of the county and to offer sufficient proof that defendant willfully and corruptly misapplied the funds.

APPEAL by defendant from *Cowper, Judge.* Judgment entered 3 June 1976 in Superior Court, BEAUFORT County. Heard in the Court of Appeals 7 April 1977.

Defendant was indicted for obtaining $434.63 from Beaufort County and the Beaufort County Department of Social Services by means of false pretenses by representing to them that she had expended her personal funds for a business trip to Boston and was entitled to be reimbursed when in fact she had expended funds from the Beaufort County and the Beaufort County Board of Social Services checking account which funds she failed to repay after obtaining reimbursement from the county. Defendant was also indicted for embezzling $1,300.00 from the county and the Department of Social Services and for misapplying $1,128.94 belonging to the county and the Department of Social Services.

State's evidence tended to show that the Department of Social Services maintained a checking account which was within the sole control of defendant, director of the Department of Social Services; that the account contained federal and state "blind funds," i.e., money received from the Blind Commission for use as the director saw fit in the administration of the Department of Social Services' aid to the blind program; that the account also contained work release funds (funds earned by prisoners on work release to be distributed to their families), foster care funds (funds from other counties for their foster children being cared for in Beaufort County), donations, support payments (court ordered payments for dependent families) and refunds from clients who had been overpaid by the county; that "blind funds" were received and placed into the account until 1971 after which no more such payments were received; that some time shortly after 11 July 1975 a memo was sent to

defendant and the Department of Social Services stating that they were to be audited; that an audit of the account revealed that as of a certain date defendant had outstanding $1,314.64 in "advances" to herself from the account; that of those advances three checks totaling $430.75 had been drawn by defendant on the account to cover the costs of a business trip to Boston in 1974; that defendant also filed a travel voucher with the county auditor for said trip and received $434.63 from him for her alleged expenses on the trip; that the audit also revealed that defendant had expended $1,128.94 from the account for expenses such as food for the staff at staff parties, two coffee pots for the office, gifts and flowers for county commissioners, Department of Social Services' entertainment expenses, magazine subscriptions and dues; that on 20 July 1975, after receiving notice of the audit, defendant gave to one of her employees $900 in cash, telling her it was in repayment of advances made to defendant and instructing the employee to transmit the money to the county auditor which the employee did; and that on 29 September 1975 defendant deposited $414.64 into the account.

Defendant testified that when she became director of the Department of Social Services in 1968 an account containing the "blind funds" was already in existence; that these funds were discretionary and could be used for anything in the administration of the Department of Social Services; that defendant also found money lying around the office from collections for various functions and so, with the Board's approval, defendant consolidated all of the money into one checking account; that also funneled into the checking account were work release funds, foster care funds, donations for specific functions, support payments and client refunds (but these rarely remained in the account, the social worker usually drawing a check on the account immediately after their deposit made payable to the intended recipient and the refunds being paid over to the county auditor); that the account was merely a pass-through account for those funds; that defendant used the remaining funds for office expenses and advances to employees for travel expenses pending their reimbursement by the county, which often took as much as two months; that the Board was aware of and approved the practice of making travel advances; that all advances to employees had been repaid; that defendant repaid part of the advances for the Boston trip by giving $180 in cash to Mr. Randolph, former Chairman of the Board, at a

Board meeting; that the $180 represented $114 given to defendant by two women who shared her hotel room in Boston and $66 for defendant's share of the hotel cost; that Mr. Randolph misplaced the money and for that reason only it was not in the account at the time of the audit; that the money was subsequently found but prior to finding it defendant had the two women give her backdated checks in order to have proof that they had shared expenses; that defendant's office expenditures from the account would eventually deplete the discretionary or blind funds entirely since they have ceased coming in, although defendant does not know how much blind money is in the account; that the $900 payment to Mrs. Modlin together with the $414.64 deposit which was made by defendant after the audit commenced consisted of money which was already in the account in that it was cash on hand; that the "account" consisted of the amount in the checking account, the amount of cash on hand and the amount represented by advances; and that advances were often repaid in cash and the cash then used for some other · expenditure without being deposited into the checking account. Four present or former Board members and three present or former county commissioners testified and they corroborated defendant's testimony as to their approval of the office expenditures from the account and their knowledge of defendant's practice of advancing travel funds from the account even though the Commission's policy was for employees to expend their own funds for travel prior to being reimbursed by the county. They further testified that neither the Board nor the county commissioners had adopted a policy governing use of the account but had left it to defendant's discretion; that they did not know exactly what funds were in the account although they knew it contained "blind funds" and referred to. the account as defendant's discretionary account; that defendant had asked for bookkeeping help with the account several times; that they knew of the advances and approved them on the basis of their understanding that they would be repaid. Mr. Randolph, a member of the Board from 1969 to 1975 and chairman from 1973 to 1975, testified that he knew the contents of the account and approved defendant's expenditures therefrom while he was chairman and that he knew of no instance where county funds contained in the account did not reach the recipient for whom they were intended. He also corroborated defendant's testimony concerning repayment of her advance for the Boston trip by testifying that at a Board meeting defendant had given him an envelope

State v. Agnew

containing money, although he did not count it, representing payments to her by two ladies who shared her hotel room in Boston and that he subsequently misplaced the envelope.

Defendant was convicted of all three offenses and sentenced to one year for each offense. The sentences were all suspended for two years upon payment of a total of $5,000 in fines and on condition that she not violate any laws. Defendant appealed.

*Attorney General Edmisten, by Associate Attorney Patricia H. Wagner, for the State.*

*Wilkinson & Vosburgh, by John A. Wilkinson, for the defendant.*

MARTIN, Judge.

Defendant contends that the trial court committed error when it failed to grant defendant's motions to dismiss in each of the three cases at the conclusion of all the evidence. We agree with defendant and hold that the evidence was insufficient to survive the motions.

Defendant's motions to dismiss, made at the close of all the evidence, draw into question the sufficiency of all the evidence to go to the jury. See *State v. Hitt,* 25 N.C. App. 216, 212 S.E. 2d 540 (1975).

Our Supreme Court has stated that:

"There must be substantial evidence of all material elements of the offense charged in order to withstand a motion for judgment of nonsuit. (Citations omitted.) If, considered in accordance with the above mentioned rule, the evidence is sufficient only to raise a suspicion or conjecture as to whether the offense charged was committed, the motion for nonsuit should be allowed even though the suspicion so aroused by the evidence is strong." (Citations omitted.) *State v. Evans* and *State v. Britton* and *State v. Hairston,* 279 N.C. 447, 453, 183 S.E. 2d 540, 544 (1971).

### CHARGE OF FALSE PRETENSE

The crime of false pretense is statutory. G.S. 14-100. The essential elements which the State must prove to the satisfac-

State v. Agnew

tion of the jury beyond a reasonable doubt in order to convict one of the crime of false pretense are as follows:

" ' . . . [A] false representation of a subsisting fact [or of a future fulfillment or event as provided in G.S. 14-100 as amended in 1975], calculated to deceive, and which does deceive, and is intended to deceive, whether the representation be in writing, or in words, or in acts, by which one man obtains value from another, without compensation. . . . ' " *State v. Davenport,* 227 N.C. 475, 495, 42 S.E. 2d 686, 700 (1947); see also *State v. Roberts,* 189 N.C. 93, 126 S.E. 161 (1925); *State v. Wallace,* 25 N.C. App. 360, 213 S.E. 2d 420 (1975); *State v. Banks,* 24 N.C. App. 604, 211 S.E. 2d 860 (1975).

[1] The indictment for false pretense and the State's theory of the case seems to be that defendant, after having obtained Social Services' funds to fund the Boston trip, collected the same amount from the county treasurer and accountant and failed to reimbmurse the Department of Social Services for these expenditures until after an audit had begun. It contends that in February 1975 she submitted a claim for reimbursement for travel for $588.78, of which $434.63 was to reimburse her for her trip to Boston; and she did not reimburse the Department of Social Services until 29 September 1975.

Intent is a subjective matter which seldom can be proved by direct evidence but may be inferred from the circumstances existing at the time of the alleged commission of the crime charged. *State v. Little,* 278 N.C. 484, 180 S.E. 2d 17 (1971). The State's evidence affirmatively shows that the Department of Social Services maintained bank account No. 7-099-050. This account was referred to as the "revolving account," which consisted of funds on deposit and cash on hand. It was used for, among other things, advances to personnel of the Department to defray travel expenses pending their receipt of reimbursement from the county. These repayments were sometimes delayed for several months but were eventually all repaid. On 28 February 1975 the county reimbursed defendant for expenses on the Boston trip.

The indictment charges that:

" . . . [S]he had not expended her personal funds but funds belonging to Beaufort County and the Beaufort County

Board of Social Services maintained in Account Number 7-099-050, and she, the said Betty Agnew, then and there knowing she was not entitled to be reimbursed and upon being reimbursed not placing said reimbursement in Account Number 7-099-050."

The State's evidence shows that the "revolving account" was not altogether money belonging to Beaufort County but came from various sources. The account was in control of the defendant subject only to the approval of the Beaufort County Board of Social Services. Mrs. Agnew made herself an advance from the revolving fund for the Boston trip which was to be paid ultimately by the county and she was responsible for its replacement to the revolving fund. Her request to the county for reimbursement was not to collect twice for the same expenditures but to repay the revolving fund the advance for which repayment she was personally responsible. All the evidence shows that advances from the revolving fund, regardless of who they were made to, were to be repaid and were repaid by the recipient thereof. The county owed Mrs. Agnew travel money for the Boston trip and Mrs. Agnew owed the revolving account of the Social Services Department for advances for the trip. The revolving account of the Social Services Department was never responsible for travel expenditures. It was used only for advances pending reimbursement by the county. The defendant's request for reimbursement was not a fraudulent representation and the motion for nonsuit at the close of all the evidence should have been allowed.

### CHARGE OF EMBEZZLEMENT — G.S. 14-90

G.S. 14-90 makes it a felony to embezzle or to fraudulently or knowingly misapply property received by virtue of office or employment. The meaning of fraudulent intent as used in G.S. 14-90 is the intent to willfully or corruptly use or misapply the property of another for purposes other than that for which it is held. See *State v. Howard*, 222 N.C. 291, 22 S.E. 2d 917 (1942) ; *State v. McLean*, 209 N.C. 38, 182 S.E. 700 (1935).

The bill of indictment charges the embezzlement of $1300.00. In instructing the jury relative to the charge of embezzlement the court stated:

"He further testified that Mrs. Agnew gave him a card listing all advances made by her by check and number and

amount. That the total of these was $1,314.64. That this is the charge of the $1,300.00, the reason for the charge of $1,300.00."

[2]   The State's evidence shows that defendant gave Mrs. Modlin $900 in cash on 20 July 1975 to be sent to the county auditor in payment of several accounts. Mr. Green testified: "I determined from an examination of the records that $414.64 did get back into the account on September 29, 1975."

Evidence offered by the State tends to show that expense money was customarily procured from the revolving account to defray authorized travel expense of Social Services employees. Vouchers for repayment by the county were submitted to the county accountant's office. Upon payment the funds were repaid to the Social Services revolving account and thereupon retained either in cash or by deposit in account No. 7-099-050.

The revolving account consisted of both funds on deposit and funds on hand. In his report to the Board of County Commissioners, Mr. Gutfeld stated:

"During our evaluation of internal control, we found that many employees had access to cash receipts and kept them within their control. Management was apparently not aware of the location of all cash funds, and in at least one case did not have access to the cash, due to the fact that an employee was on vacation."

However, the inadequate control of the funds of itself does not import criminality. The funds were on hand, in the possession of the Department of which the defendant was responsible, and were accounted for. We perceive no inference of guilt because the $900 payment to the county was not deposited in the bank nor is there an inference of guilt of embezzlement because the $414.64 was deposited in the bank after an uncompleted audit had commenced. The $414.64 was available in cash for accounting purposes on 15 August 1975. As long as the funds were on hand in the possession of the defendant for disbursement at the proper time, there can be no fraudulent conversion or appropriation.

Mr. Green testified:

"Mrs. Agnew accounted for the money on the Boston trip except for $180.75—she accounted for it in the manner I

have previously testified, that she had given cash to Mrs. Sue Modlin. She said she gave cash to Mrs. Sue Modlin except for $180.75 which was the check to the hotel.

\* \* \*

Mrs. Modlin stated that Mrs. Agnew had given her $900.00 in cash. . . .

\* \* \*

[W]e pinned that date down to about July 20th, I believe.

The total on the tape is $1,314.64. My examination of the records showed only $414.64 was deposited in the account on September 29, 1975. The $900.00 was not deposited into the account.

\* \* \*

Mrs. Modlin said that $900.00 was cash from Mrs. Agnew to be refunded to the account.

\* \* \*

Mrs. Modlin said she did use that money to make refunds to the county accountant.

\* \* \*

The money did not go back into the account. She did take the cash money and pay some refunds to the county accountant's office."

Mr. Gray of the accounting firm of Gutfeld and McRoy, stated:

"The $180.75 was totally accounted for on the following Monday after about a three or four day lag.

\* \* \*

I talked to her about what is on the back of the card. This was the money that she had paid back from her advances and that was returned to Mr. Hodges, the county accountant. It was $900.00.

I don't remember if she told me when the $900.00 was returned to the county accountant but I looked at the date,

I looked back and found out when it was returned. I think it was August 1st, I am not positive.

* * *

This money was turned over with some other money to Mr. Hodges and I traced it to what it was turned over but it was $900.00 of this money was turned over at this time but there was some more money turned over to Mr. Hodges at that time."

The audit report of Mr. Gutfeld shows that on 7 August 1975 Mrs. Agnew, Department of Social Services, had $314.05 cash on hand, checks totaling $180.75 (Agnew $66.61) (Bolton $57.07) (Allen $57.07) and on 15 August Mrs. Agnew had $100.00 cash on hand. Mrs. Agnew informed Mr. Gutfeld that the sum of $100.00 was overlooked when original cash counts were made.

The report further shows that cash receipts received by the county accountant from the Department of Social Services on 1 August were $1,792.24.

State's witness, Sue Modlin, testified:

"Mrs. Agnew gave me $900.00 in cash. I think that was the beginning of August.

I don't remember whether she gave it to me while the Gutfeld audit was underway. I don't remember dates and times. We have been investigated by everybody under the sun and who came when I don't remember.

About the $900.00, I have previously said that the PA-12 receipt refund forms had been typed up, and on this form it indicates the client's name who is making the refund; the amount to be repaid; the program for which the refund is made and the account number, program number; identifying information for our department and for the State Office. These had been prepared and were being held because I had not been able to get with Mrs. Agnew to get the right amounts of money to put with the forms because of the other activities going on within the department.

We had the forms and Mrs. Agnew had $900.00.

I don't know where the $900.00 came from. It was refunds that had been made.

That is what Mrs. Agnew said, refunds that she had paid back, advances that she had paid back.

She said it was advances that she had paid back.

She didn't tell me anything about this $900.00 in advances that she had paid back.

The $900.00 was used to transmit those refunds to Mr. Hodges.

\*　　\*　　\*

I am aware of a State policy having to do with the length of time allowed for the repayment of advances that have been received from time to time by various employees of this agency and other similar agencies.

Q. What is that period of time for repayment?

A. Within the fiscal year."

State's exhibit 15 shows 12 advances to and repayment thereof by Mrs. Agnew numbered by check with initialed approval by the chairman of the Board of Social Services. Mr. Gutfeld testified:

". . . [s]he [Mrs. Agnew] stated that she had a card where she listed the advances and repayments, the advances that were made to her and the repayments that were made by her. She exhibited a card to me on that occasion. State's Exhibit Number 15 which you are showing me is the card Mrs. Agnew showed me."

The total of these advances is $1,314.64. State's exhibit 3, a check book, shows by its stubs the advances having been made on 12 July 1974, 10 August 1974, October 10, 1974, October 10, 1974, October 16, 1974, November 30, 1974, November 30, 1974, December 3, 1974, December 20, 1974, February 22, 1975, February 27, 1975, and February 25, 1975. On the stubs we find in red ink a notation that cash for each advance had been refunded to Modlin.

The State has presented evidence which tends to show that Mrs. Agnew received advances from the revolving account in the amount of $1,314.64 over a period of less than one year. On 28 February 1975, she was paid $588.78 for travel expenses for the months of October and November 1974. She gave Sue

State v. Agnew

Modlin $900.00 in cash on 20 July 1975 which was turned over to the county accountant. She had in her possession in the Department of Social Services the further sum of $414.64 on 15 August 1975. On 29 September 1975 $414.64 was deposited in the revolving account. Further, the controversial item of $180.75 was totally accounted for by the testimony of Mr. Gray. The only conclusion that can be deduced is that Mrs. Agnew was in charge of the revolving account. She had advanced to herself funds to defray travel expenses in the sum of $1,314.64 and paid over to the county accountant $900 and redeposited $414.64. The $900.00 was turned over to the county accountant on 20 July 1975. The Gutfeld audit commenced 7 August 1975 and ended 18 August 1975. The deposit in the revolving account was on 29 September 1975. The audit by Mr. Green commenced in December 1975. It was customary for Social Service employees to obtain advances from the revolving account to defray traveling expenses until they could be reimbursed by the county. The questioned funds were in the possession of the defendant.

Embezzlement has been defined as:

" '[T]he fraudulent conversion of property by one who has lawfully acquired possession of it for the use and benefit of the owner.' The mere act of converting or appropriating property to one's own use is not sufficient to constitute the offense. In order to convict, the State must not only offer evidence of appropriation, but it must go farther and offer evidence that such act was done with a fraudulent purpose or corrupt intent." *State v. Cohoon*, 206 N.C. 388, 393, 174 S.E. 91, 93 (1934).

The only evidence which would give rise to an inference of a conversion or appropriating was the failure of the defendant to deposit the $900.00 in the bank and the deposit of the $414.64 after the audit began. It will be remembered that the $414.64 was on hand on 15 August 1975 and counted by Mr. Gutfeld. We are not aware of any legal requirement that trust funds must be deposited in a bank although good judgment would so dictate. Conceding *arguendo* there was an appropriation or conversion, we fail to find evidence that such act was done with a fraudulent purpose or corrupt intent. The act of conversion does not raise the presumption of a felonious intent in a prosecution of an indictment for embezzlement. *State v. Cohoon, supra.*

Evidence of fraudulent or corrupt intent is lacking in the case at bar. There is no evidence that defendant used the funds for her benefit. The revolving account consisted of both funds on deposit and cash on hand. From the funds on hand, payment was made to the county accountant in the sum of $900.00. From cash on hand, the sum of $414.64 was deposited in the revolving account. There is no evidence as to when the advanced funds were replaced in the "cash" account. The evidence shows that $900.00 was on hand on 20 July 1975. The control card, (State's exhibit 15), shows the various amounts advanced were repaid and approved by the chairman of the Board of Social Services. There is no evidence that the funds were not turned over to the county accountant at a time when obligated to do so. Cash in the sum of $414.64 was on hand on 15 August 1975 and deposited 29 September 1975.

Thus, the State has proved that advancements were made to employees of the Social Services Department from the revolving account for travel; that defendant was custodian of the funds on deposit and cash on hand; that advancements were repaid and held as cash on hand or on deposit; that records of cash transactions were evidenced by control cards; and that funds were repaid within a year and turned over to the county when obligated to do so.

The law does not build the crime of embezzlement upon such proof, and the motion for nonsuit at the close of all the evidence should have been allowed.

CHARGE OF EMBEZZLEMENT OF FUNDS — G.S. 14-92

[3] The indictment charges that defendant willfully and corruptly used and misapplied $1,128.94 for purposes other than that for which it was held. The State, in its brief, argues that expenditures for a punch bowl, a coffee pot, a refrigerator, cakes, pies, gifts for Board members, and an advance to Sue Modlin for vacation expenses and rent could not be considered a proper use of county funds.

In *State v. Shipman*, 202 N.C. 518, 540, 163 S.E. 657, 669 (1932), the Court defined wilful, corruption, and bad faith as used in the statute, as follows:

"[W]ilful is defined: 'Proceeding from a conscious motion of the will; intending the result which actually comes to pass; designed; intentional; malicious. . . . In common

parliance, "wilful" is used in the sense of "intentional," as distinguished from "accidental" or "involuntary." But language of a statute affixing a punishment to acts done wilfully may be restricted to such acts done with an unlawful intent.' " (Citations omitted.)

" 'Corruption,' (citation omitted) : 'Illegality; a vicious and fraudulent intention to evade the prohibitions of the law. The act of an official or fiduciary person who unlawfully and wrongfully uses his station or character to procure some benefit for himself or for another person, contrary to duty and the rights of others.' The word 'corruptly' when used in a statute generally imports a wrongful design to acquire some pecuniary or other advantage." (Citations omitted.)

" 'Bad Faith,' (citation omitted) : 'The opposite of "good faith," generally implying or involving actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive.' Bad faith and fraud are synonymous." (Citation omitted.)

Furthermore, the defendant must have a felonious intent. Unless the intent is proved, the offense is not proved. *State v. Lancaster,* 202 N.C. 204, 162 S.E. 367 (1932).

Over defendant's objection, the court allowed the introduction into evidence of State's exhibit 4-C which was entitled "Beaufort County Social Services Schedule of Unauthorized Expenditures Wachovia Bank and Trust Account 7-099-050." It concludes with the statement: "Total Unauthorized Expenditures $1,128.94." This exhibit lists 54 items bearing "date," "payee," "check number," "for," and "amount." The dates extended from March 16, 1971, to April 1, 1975. Mr. Green testified: "I talked to her [Mrs. Agnew] about State's exhibit 4-C. . . . Her response to these items were items that were paid with the Blind money." State's witness Grady R. Galloway testified:

"The item attached to that memorandum is a check in the amount of $620.00.

*       *       *

The check was endorsed by the Director of Social Services, Betty Agnew.

\*     \*     \*

Any expenditures from this particular fund made by Mrs. Agnew would be left to her discretion . . . if it would enhance the program for the blind.

\*     \*     \*

We did not find any irregularities in the administration of the program by Mrs. Agnew here in Beaufort County."

State's exhibit 1 is a memorandum from Mr. Galloway and attached thereto is a check from the Commission for the Blind payable to Beaufort County Welfare Director in the sum of $620.00. This is the fund mentioned by Mr. Galloway that was to be used by Mrs. Agnew in her discretion. State's exhibit 20 is entitled "Beaufort County Social Services Department—Undisbursed Bank Deposits—Wachovia Bank & Trust Company Account Number 7-099-050." The first item on exhibit 20 is a deposit from the North Carolina Blind Commission dated April 6, 1971 and was explained as "Federal Earned Administration Fund" and the amount was $360.87. The funds on exhibit 20 totaled $1,266.72 and were from various sources extending from 1971 to June 8, 1975.

We think the State has not only failed to identify the funds expended as those of the county, but has failed to offer proof sufficient to be submitted to the jury that defendant willfully and corruptly misapplied county funds.

After a thorough study and analysis of the evidence, we can see no crime and no competent proof of any crime described in the bill of indictment.

Defendant's motions to dismiss each case at the conclusion of all the evidence should have been allowed.

Reversed.

Judges BRITT and PARKER concur.